```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
```

ROBERT SAMHOLT,                  )
                                 )
     Petitioner,                 )
                                 )
     v.                          )    1:06CV00407
                                 )
MAUREEN MARSHALL SAMHOLT,        )
                                 )
     Respondent.                 )

                    MEMORANDUM OPINION

OSTEEN, District Judge

Petitioner Robert Samholt initiated this action by filing a Verified Petition for Return of Child pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501, and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601 et seq. Petitioner alleges that his daughter has been wrongfully retained in the United States by her mother, Respondent Maureen Marshall Samholt. The court must determine whether, pursuant to the Hague Convention, the child must be sent to Sweden for a determination of the custody rights of her parents or whether such a determination may be made in the United States.

I.  **FINDINGS OF FACT**

Robert Samholt, a citizen of Sweden, and Maureen Marshall Samholt, a citizen of the United States, met while Robert was working in Greensboro. They married in November 1999, and their

child, Emma, was born in April 2000.[1]  Robert was working in Greensboro on a contract with a set expiration date.  Robert and Maureen decided that Robert would seek permanent employment in the United States; he attempted to obtain a work visa, but his efforts were unsuccessful.  Following the expiration of his contract in October 2000, the Samholt family moved to Gothenburg, Sweden, where they lived together until May 2002.

In May, Maureen traveled, along with her children, to the United States to visit family.  Upon her arrival, she informed Robert that she intended to remain in the United States.  Robert initiated a proceeding under the Hague Convention.  In response, Maureen returned to Sweden with Emma.  After a period of living separately, Robert and Maureen reconciled and resumed living as a family in Sweden.  During this period, Emma was attending preschool in Sweden.

In June 2004, Maureen again indicated to Robert that she wished to return to the United States with her children.  Robert acquiesced, and, in anticipation of the move, Robert and Maureen participated in mediation with the intent of negotiating arrangements for the care of Emma in the future.  As a result of the mediation, Robert and Maureen signed two documents, one in Swedish and one in English.  Each document provided that Emma would spend certain periods of time with Maureen in the United States and certain periods with Robert in Sweden.  Although these

---

[1] Maureen already had a son from a previous relationship; the son lived with Maureen throughout the period described here.

documents were intended to embody a single agreement, they were not equivalent. The English-language version contained at least one phrase not found in the Swedish-language version, and there were other differences as well. The parties did not, at that time, discuss the fact that the documents were not equivalent, nor did they agree that one of the versions would control.

Maureen returned to the United States with Emma in October 2004. In accordance with provisions found in both of the documents, Emma lived with Robert in Sweden from March to August 2005 and then returned to the United States. In September 2005, Emma began kindergarten in Greensboro. Her teachers observed that she had problems with English, and she was considered for an English as a Second Language program; however, her English eventually improved to the point that she participated in regular classes. Around that time she joined a Girl Scout troop and began attending a church.

Before Emma returned to the United States in August 2005, Robert proposed to Maureen that they enter into another written agreement, containing provisions similar to those found in the earlier written documents but also including additional rights and responsibilities for the parents. Robert submitted several drafts of his proposed agreement to Maureen, but she refused to sign them. On December 16, 2005, Maureen filed an action in Forsyth County, North Carolina, seeking a determination of custody of Emma. She received an order awarding her exclusive care, custody, and control of Emma pending further proceedings.

3

Around Christmas 2005, Robert contacted Maureen to arrange for Emma to return to Sweden. Maureen refused to allow Robert to take Emma at that time. She has continued to refuse to allow Robert custody of Emma, although Robert has since had the opportunity to visit with Emma in Greensboro.

**II. CONCLUSIONS OF LAW**

The Hague Convention is intended to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, preamble, 19 I.L.M. at 1501. To invoke the Hague Convention, a petitioner seeking the return of a child must show, by a preponderance of the evidence, that the child was "wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). "[A] petitioner can establish that removal of a child is 'wrongful' where: (1) the child was 'habitually resident' in the petitioner's country of residence at the time of removal, (2) the removal was in breach of the petitioner's custody rights under the law of his home state, and (3) the petitioner had been exercising those rights at the time of removal." Bader v. Kramer, 445 F.3d 346, 349 (4th Cir. 2006). For the following reasons, the court concludes that Petitioner has failed to carry his burden as to the first requirement, dealing with habitual residence.

4

The determination of a child's habitual residence is "a fact-specific inquiry that should be made on a case-by-case basis." Miller v. Miller, 240 F.3d 392, 400 (4th Cir. 2001). Although there is no formal definition of the term, federal courts have identified a series of guiding principles for making the determination. "[T]he court must focus on the child, not the parents, and examine past experience, not future intentions." Friedrich v. Friedrich, 983 F.2d 1396, 1401 (6th Cir. 1993). Additionally, "a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir. 1995). However, when the child in question is very young, the child's perspective may not be readily discernible, in which case a court should look to "the settled purpose and shared intent of the child's parents in choosing a particular habitual residence." Whiting v. Krassner, 391 F.3d 540, 550 (3d Cir. 2004). The shared intentions of both parents for a child to establish a residence at a particular location, coupled with actions to establish the residence, may create a new habitual residence within a short time period. See, e.g., Feder, 63 F.3d at 224-25 (holding that a child's habitual residence was established in six months); see also Humphrey v. Humphrey, 434 F.3d 243, 248 (4th Cir. 2006)(citing, with approval, the Feder analysis). Importantly, though, the emphasis is on the shared intentions of the parents rather than the

5

unshared intentions harbored by one parent.  See Feder, 63 F.3d at 224.  "[A] parent cannot create a new habitual residence by wrongfully removing and sequestering a child."  Miller, 240 F.3d at 400.

Petitioner alleges that the wrongful retention of Emma took place in December 2005, so the court must examine the events immediately prior to that time to determine habitual residence. To the extent that the evidence provides insight into Emma's perspective, the court concludes that she was acclimatized to and experienced a settled purpose in Greensboro.  The evidence indicates that, from August to December, Emma's life in the United States was a normal one.  She attended school, she attended church, and she engaged in at least one extracurricular activity.  She made friends, and she was close to family members in the area.  Although she initially had some difficulty with language, that difficulty was resolved.  Regarding a settled purpose, the enrollment in school is particularly important, because, for a child of six, school provides a focus around which all other events are scheduled. A child who is enrolled in school expects to go to school every day and to complete a school year.  Petitioner has produced no evidence that Emma had any other expectation or that she anticipated returning to Sweden at any specific time.  Thus, the court is convinced that she did not experience life in the United States as temporary and that, by December, she was settled in the United States.

6

This conclusion, however, does not resolve the issue of habitual residence. First, there is also evidence suggesting that Emma was equally settled in Sweden, where she had a home, a school, family, and friends. It is likely that, from Emma's perspective, she had two residences, but "[a] person can have only one habitual residence." Friedrich, 983 F.2d at 1401. For this reason, the court must look outside of Emma's experience to her parents' intentions. Additionally, the court would not be bound by its conclusion if Emma's circumstances were the result of the unilateral actions of her mother. If Maureen acted either contrary to Robert's intentions or simply without his knowledge, her actions would not be sufficient to create habitual residence. Therefore, the court must also determine whether Maureen and Robert shared any intentions with regard to Emma's residence.

An obvious starting place for determining their intentions is the agreement into which they entered shortly before Maureen returned to the United States in 2005.

There is, however, an important dispute between the parties over the contents of the agreement. As discussed, the parties signed two copies of the agreement, one in Swedish and one in English. Only recently did they realize that the two were not precisely equivalent. Specifically, the English version contains a clause indicating that the United States would be Emma's "primary residence." The Swedish version does not contain any language expressing an equivalent phrase. There are several additional differences that could also be relevant to the current

7

inquiry. Robert testified that he perceived the Swedish version to express their agreement, while Maureen testified that she perceived the English version to do so. At the hearing, neither party established that either of the documents controlled, and the court concludes that neither document embodied their agreement.

Despite this, the documents should not be totally ignored. Although there may have been no written embodiment of their agreement, the evidence indicates that they did agree about some aspects of Emma's life. For the purposes of this inquiry, the court is less concerned about the precise parameters of their agreement than about their intention with regard to a few key elements of Emma's living arrangements. In combination with other evidence, the documents provide insight into these elements. Based on the evidence as a whole, the court has reached the following conclusions.

Robert was aware that Maureen wanted to return to the United States to live, and he was aware of her desire to take Emma with her. Maureen had attempted to do so in 2002 and had only returned after Robert filed a Hague Convention petition. When their reconciliation failed, Maureen returned to the United States, and there is no evidence that either Robert or Maureen regarded the move as anything but a lasting separation. Thus, when Robert allowed Emma to travel to the United States in August 2005 to live with Maureen, he was aware that Maureen intended to

reside permanently in the United States and did not intend to return to Sweden to live with Emma.

Additionally, the evidence indicates that Robert made no efforts to establish a time at which Emma would return to Sweden permanently. Rather, it appears that he expected her to return for Christmas 2005 and for several months in the summer of 2006. He was aware that she had been enrolled in school in the United States and lodged no protest, and the timing of her anticipated travel to Sweden indicates that it was structured around her school year in the United States. Robert testified that he anticipated that this schedule might be modified as Emma grew older, but he did not testify that there were any plans to modify it or an agreement that it would be modified.

In sum, Robert acquiesced to Emma's living with Maureen at Maureen's permanent home in the United States for at least three quarters of the year, while Emma was in school, for the foreseeable future. Here, again, enrollment in school is particularly important. School provides a strong tie to a particular location because parents cannot readily move a child during a school year without disrupting the child's education, something that parents in general, and Robert and Maureen in particular, were reluctant to do. By agreeing that Emma should begin school in the United States, Robert indicated an expectation that Emma's life would be focused in Greensboro in the near future.

9

The court believes that Robert did not intend for Emma's primary residence to change to the United States. He may have intended that the year be divided as equally as possible between himself and Maureen, within the constraints of Emma's school year. He clearly expected his access to Emma and input on decisions about her life to be different than they turned out to be. But the evidence indicates that he did intend that, for the foreseeable future, more of Emma's time would be spent in the United States than in Sweden and that her schooling would take place in the United States. Those circumstances are sufficient to effect a change in Emma's habitual residence. As a result, although he did not specifically agree to the legal consequence, he did agree to each of the underlying circumstances that gave rise to the change.

Based on this reasoning, the court concludes that, in December 2005, the habitual residence of Emma was the United States. Therefore, there was no "wrongful retention" of Emma in the United States at that time. Petitioner has failed to carry his burden to demonstrate by a preponderance of the evidence that Emma should be returned to Sweden.

### III. CONCLUSION

For the reasons set forth above, Robert Samholt's Verified Petition for Return of Child pursuant to the Hague Convention on the Civil Aspects of International Child Abduction will be denied.

10

An order and judgment in accordance with this memorandum opinion shall be filed contemporaneously herewith.

This the 26th day of July 2006.

_____
United States District Judge